# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DEVONSHAY T.A. HILLELAND,

    Defendant.

Case No. 5:19-CR-40059-HLT

## MEMORANDUM AND ORDER

Defendant Devonshay Hilleland is charged with possession of a firearm by a prohibited person. He moves to suppress all evidence obtained during an encounter with law enforcement. Doc. 13. He contends law enforcement obtained the evidence in violation of the Fourth Amendment. Because law enforcement initiated a consensual encounter and had reasonable suspicion before the encounter possibly ripened into a detention, the Court finds that a Fourth Amendment violation did not occur and denies the motion.

## I. BACKGROUND[1]

On May 27, 2019, between 12:30 and 1:00 a.m., law enforcement received a call for service in response to gun shots fired in the 1500 block of NW Taylor Street, Topeka, Kansas. Kansas Highway Patrol Trooper Justin Dobler responded in a support capacity. While there, he learned that two African-American males were involved in a physical disturbance with a homeowner and guest. One of the males was large, the other skinny. As the males drove away, one of them fired shots into the air. Their vehicle headed south on Taylor. Witnesses gave varying descriptions of

---

[1] During the March 12, 2020 hearing the Court heard testimony from Trooper Justin Dobler. Based on Trooper Dobler's demeanor and attentiveness during questioning—and given that, at times, he conceded facts not helpful to the government's case—the Court credits his testimony in its entirety. But the Court relays only those portions of Trooper Dobler's testimony relevant to its resolution of the motion.

the vehicle, which included that it was similar to an HHR or hatchback or something with a flat rear end. At one point, someone indicated it might have been a pickup or a Cube. But the witnesses agreed the vehicle was either silver or tan and did not have a normal Kansas-issued license plate. It occurred to Trooper Dobler that it could have had a temporary dealer tag. The homeowner stated that the males were inebriated and incoherent and that he saw no reason for them to return.

After he left the scene, Trooper Dobler patrolled the north Topeka area in a marked SUV looking out for retaliation or additional disturbances. He eventually positioned himself three to four miles southeast of the incident at the intersection of Monroe and Morse Streets just west of the Sardou Bridge (a main thoroughfare in the direction of the scene) to serve as an enforcement presence. He was not looking for any particular vehicle because of the description discrepancies. There were not many cars on the road, but, about an hour after the shooting incident, Trooper Dobler observed a silver Honda Civic driven by an African-American male cross the bridge and turn north onto Monroe. The Honda had a Kansas dealer tag. Trooper Dobler recognized this vehicle had a silver color, a black male driver, and a dealer tag, but he did not immediately associate the Honda with the suspect vehicle from earlier in the night. He was primarily interested in the tag itself. In his training and experience, it is not uncommon for dealer tags to be displayed on stolen vehicles in Topeka. Without activating his emergency lights or siren, Trooper Dobler followed the Honda and planned to run the tag.

But he did not have a chance to run the tag because the Honda "immediately" turned into the driveway, which was located at 1223 NE Monroe Street. Trooper Dobler pulled to the curb behind the driveway and partly blocked the driveway, such that it would have been very difficult for the Honda to pull out. Defendant (who was the driver) was already out of the vehicle, had shut the door, and was walking towards the residence. Trooper Dobler remained seated in this SUV and

asked Defendant through his open window whether he could ask Defendant about the dealer tag displayed on the vehicle. Defendant replied that it was his brother's car and that he did not know anything about it. During this exchange, Trooper Dobler did not turn on his lights or sirens, did not shine a spotlight or flashlight on Defendant, did not tell Defendant to stop, and did not tell Defendant to come over to him. Trooper Dobler did not ask him more questions at this point.

Defendant then walked to the front door of the house and knocked. A resident answered, leaving the screen door closed. Trooper Dobler listened to make sure the resident was safe and overheard Defendant ask if someone was there. The resident looked at Trooper Dobler's SUV and replied that he had no clue whom Defendant was looking for and shut the door. Trooper Dobler then thought that "nothing's making sense." He explained that it did not make sense because of his experience with the use of dealer tags, the time of night, Defendant's behavior of quickly pulling into a driveway when Trooper Dobler began following him and walking up to the house (which Trooper Dobler considered evasive behavior based on his training and experience), and the resident's reaction to Defendant.

As Defendant returned to the Honda, Trooper Dobler got out of his SUV and approached the vehicle. As he approached, Trooper Dobler saw a male African-American passenger for the first time. When he made contact, Defendant was seated in the vehicle but had his feet outside of it. Trooper Dobler asked if he could retrieve the Honda's VIN to see if it was stolen. Defendant repeated that it was his brother's car and that he did not know anything about it and added that he was going to call someone to pick him up. Trooper Dobler was able see the VIN to transcribe it by looking inside the windshield from outside the vehicle. As Trooper Dobler was returning to his SUV, Defendant exited the Honda and began pacing on the sidewalk attempting to call people. During this exchange, Trooper Dobler did not activate his lights or siren, did not make any

3

commands not to leave, did not draw his service revolver, did not ask for any identification, and was the only law enforcement officer present.

Trooper Dobler ran the VIN number—the results of which are almost always instantaneous—and learned that the Honda was reported stolen. Trooper Dobler testified that it was less than five minutes from the point he asked his first question to when he learned that the vehicle was reported stolen. He then backed his SUV up so that he could view the whole scene, as Defendant had walked about ten feet from the Honda and was on a cellphone. The passenger remained in the vehicle. Trooper Dobler requested backup, activated his emergency lights, and told Defendant that he was not free to leave. Defendant, who was still attempting to make calls, stated: "I was gonna go, but you turned your lights on . . . . Is there something wrong?" Trooper Dobler explained that the Honda was stolen, and Defendant was taken into custody. Law enforcement searched the Honda and found a firearm under the driver's seat. Defendant admitted it was his. Trooper Dobler did not think Defendant appeared intoxicated.

Based on the evidence collected, a grand jury returned an indictment charging Defendant with one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1). Doc. 1. Defendant now moves to suppress the evidence found as a result of the encounter. Doc. 13.

**II.   ANALYSIS**

Defendant contends Trooper Dobler violated his Fourth Amendment rights by seizing him without reasonable suspicion. The Fourth Amendment prohibits unreasonable seizures. U.S. CONST. amend. IV. But not every police-citizen encounter rises to a seizure. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991). Rather, there are three types of police-citizen encounters:

> (1) [C]onsensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth

> Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

*United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006) (quotation omitted). Thus, to resolve this motion, the Court must determine what type of encounter occurred and whether Trooper Dobler had the requisite level of suspicion or cause.

### A. Initial Encounter

Defendant contends that Trooper Dobler seized him when Trooper Dobler initially asked Defendant about the dealer tag and that this seizure violated the Fourth Amendment because Trooper Dobler lacked reasonable suspicion. The government contends this interaction is a consensual encounter and does not implicate the Fourth Amendment. The Court agrees with the government.

In determining whether a police-citizen encounter is consensual, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Bostick*, 501 U.S. at 437 (quotation omitted). Courts consider the following non-exhaustive list of factors to determine whether a reasonable person would feel free to leave:

> [T]he location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*Lopez*, 443 F.3d at 1284 (quotation omitted). "Although no single factor is dispositive, the strong presence of two or three factors may be sufficient to support the conclusion a seizure occurred." *Id.* at 1284-85 (quotation omitted).

During the initial encounter, Trooper Dobler followed the Honda to the driveway, pulled up to the curb behind the driveway, and asked Defendant through his open window whether he could ask Defendant about the dealer tag. Defendant answered his question, walked away from Trooper Dobler, approached the house, and knocked on the door. Although Trooper Dobler was uniformed and in a marked SUV, Trooper Dobler was the sole law enforcement officer present and remained seated in his SUV during the initial encounter. Trooper Dobler did not activate his lights or sirens, did not shine a spotlight or flashlight on Defendant, did not tell Defendant to stop, did not tell Defendant to come over to him, did not ask for any identification, did not physically touch Defendant, and did not ask Defendant any more questions at this point.[2] Although Trooper Dobler did not specifically advise Defendant that he had the right to terminate the encounter, he also started the encounter by asking Defendant whether he could ask him a question. Because a reasonable person would believe himself free to leave under the totality of these circumstances, the Court finds that Trooper Dobler's initial encounter was a consensual encounter and did not implicate the Fourth Amendment. *See, e.g.*, *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017) (concluding that a seizure did not occur when officers in a police cruiser pulled

---

[2] Defendant heavily relies on *United States v. Gaines*, 918 F.3d 793 (10th Cir. 2019). But this case is readily distinguishable. In *Gaines*, two officers in separate police cars, with their emergency lights flashing, parked behind the car in which the defendant was seated. *Id.* at 795-96. Both officers exited their patrol cars. *Id.* at 798. One gestured for the defendant to exit his car, confronted him with a report that he was selling drugs, and asked for his identification. *Id.* at 796, 799. The other circled the defendant's car and looked inside. *Id.* at 798. The Tenth Circuit held that the officers showed their authority and that no reasonable person would have felt free to leave. *Id.* at 799. Here, Trooper Dobler's actions did not come close to the officers' actions in *Gaines*.

alongside the defendant at night when no one was around and asked him questions as he walked down the street).

Defendant contends that "[t]he location (a private driveway), the time (during the night), the physical restraint of [Defendant] (via the officer blocking his car in the driveway), the marked car and uniformed officer, [and] the questioning, together establish that this encounter was a seizure, and that a reasonable person would not have felt free to leave." Doc. 13 at 7. But Defendant's description of the situation ignores the above facts and mischaracterizes others. As one example, Defendant contends Trooper Dobler physically restrained Defendant when Trooper Dobler blocked the driveway. But, as already noted, Defendant had exited his vehicle and was approaching the house (i.e., walking away from the vehicle and Trooper Dobler) when the encounter occurred. He was neither attempting to leave in his vehicle and being restrained from doing so nor having his walking path obstructed by Trooper Dobler's SUV. *See United States v. Thompson*, 546 F.3d 1223, 1228 (10th Cir. 2008) ("Where an individual is on foot when approached by the police officer, the fact that his car may be blocked does not, in itself, render the person's decision to answer questions or consent to a search involuntary."). The situation also does not inherently send a message of restraint and seizure when one realizes that the curb of the driveway appears to be the closest point from which Trooper Dobler could talk to Defendant through an open window while remaining seated in his SUV and on the public street. For these reasons, and the others listed above, the Court finds the initial encounter did not implicate the Fourth Amendment.

### B.     Second Encounter

The nature of a police-citizen encounter can change, so the Court must examine whether the initially consensual encounter changed to a different type of encounter after Defendant spoke

with the resident and returned to his vehicle. Although the parties dispute whether this second encounter remained consensual or ripened into an investigative detention, the Court need not decide that precise question because the Court finds that Trooper Dobler had reasonable suspicion before he initiated the second encounter.

In determining whether reasonable suspicion exists, courts look to the totality of the circumstances and decide "whether a particularized and objective basis, viewed from the standpoint of an objectively reasonable officer, existed for suspecting legal wrongdoing." *United States v. Lopez*, 518 F.3d 790, 797 (10th Cir. 2008). A court should judge "the officer's conduct in light of common sense and ordinary human experience but also grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." *Id.* (citation omitted).

In this case, Trooper Dobler has experience with stolen vehicles and, in his experience, it is not uncommon for a stolen vehicle to display a dealer tag. He noticed the dealer tag on Defendant's vehicle, which was being driven late at night, and started following it. Defendant then quickly turned into a driveway, exited the vehicle, and began approaching the residence. Based on his training and experience, Trooper Dobler thought this immediate turn into a driveway seemed like an evasive maneuver. When Trooper Dobler asked about the tag, Defendant disclaimed any knowledge of it and said the vehicle belonged to his brother. Trooper Dobler then observed Defendant's interaction with the resident. The resident did not open the screen door, had no clue whom Defendant was looking for, and shut the door after the conversation. At that point, Trooper Dobler thought that "nothing's making sense," initiated the second encounter, and approached to get the VIN to check whether the vehicle was stolen. The Court finds that Trooper Dobler had reasonable suspicion before he initiated the second encounter based on the totality of the

circumstances. Stated differently, the Court finds that a reasonable officer would have had a particularized and objective basis for suspecting legal wrongdoing. After obtaining the VIN and getting the report back that the vehicle was stolen, Trooper Dobler had probable cause to arrest Defendant. Trooper Dobler acted reasonably throughout the entire encounter. Accordingly, the Court finds that no Fourth Amendment violation occurred in this case.

## III. CONCLUSION

THE COURT THEREFORE ORDERS that Defendant's Motion to Suppress (Doc. 13) is DENIED.

IT IS SO ORDERED.

Dated: March 24, 2020 /s/ *Holly L. Teeter*
HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE